## RECORD NO. 14-1724

### IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

IN RE:  GNC CORPORATION; TRIFLEX PRODUCTS MARKETING
AND SALES PRACTICES LITIGATION (NO. II),

YVONNE BROWN; SHAWN HOWARD, On Behalf of Themselves
and All Others Similarly Situated; MICHAEL LERNA, On Behalf of
Themselves and All Others Similarly Situated; JEREMY GAATZ, On
Behalf of Themselves and All Others Similarly Situated;
ROBERT TOBACK; ROBERT CALVERT; THOMAS FLOWERS;
JOHN J. GROSS; JUSTIN M. GEORGE; LOUIS LASTRES,
On Behalf of Themselves and All Others Similarly Situated,

*Plaintiffs-Appellants,*

v.

GNC CORPORATION, a Delaware Corporation;
GNC HOLDINGS, INC.; RITE AID CORPORATION,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE  DISTRICT OF MARYLAND AT BALTIMORE

### OPENING BRIEF OF APPELLANTS

Robert J. Berg
DENLEA & CARTON LLP
Suite 509
1 North Broadway
White Plains, NY 10601
(914) 920-7400

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1724__    Caption: In re: GNC Corporation: TriFlex Products Marketing and Sales Practices

Pursuant to FRAP 26.1 and Local Rule 26.1,

Yvonne Brown; Shawn Howard; Michael Lerma; Jeremy Gaatz; Robert Toback; Robert Calvert; Thomas
(name of party/amicus)

Flowers; John J. Gross; Justin M. George; Louis Lastres

who is _____appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

10/28/2013 SCC    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/Robert J. Berg                    Date:    August 7, 2014

Counsel for: Appellants

## CERTIFICATE OF SERVICE
***************************

I certify that on ___August 7, 2014___ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/Robert J. Berg                              August 7, 2014
     (signature)                                    (date)

- 2 -

TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE

TABLE OF AUTHORITIES ................................................................. ii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE .............................................................. 2

    I.    Nature of the Case ................................................................. 3
    II.   Course of Proceedings and Disposition Below ........................ 4

STATEMENT OF FACTS ................................................................... 6

    The TriFlex Products ................................................................. 6
    The Rite Aid Products ................................................................ 9
    Scientific Studies Confirm That the Products Are Not Effective ........ 10
    The Impact of Defendants' Wrongful Conduct .............................. 13

SUMMARY OF ARGUMENT ............................................................ 14

ARGUMENT ................................................................................. 15

    I.    The Standard of Review is *De Novo* ...................................... 15

    II.   The District Court Erroneously Dismissed The CAC On June 20, 2014 ........................................................................... 16

        1.    Rule 60(b) Motion ...................................................... 27

CONCLUSION ............................................................................... 32

REQUEST FOR ORAL ARGUMENT ................................................. 32

CERTIFICATE OF COMPLIANCE .................................................... 37

CERTIFICATE OF FILING AND SERVICE ....................................... 38

# TABLE OF AUTHORITIES

## CASES

Page

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)..............................................................................1, 14, 15

*Barrie v. Intervoice-Brite, Inc.*,
　397 F.3d 249 (5th Cir. 2005) ..........................................................22

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 555 (2007)..............................................................................1, 14, 15

*Calvert v. Walgreen Co.*,
　13 Civ. 1161 (W.D. Pa. May 6, 2014).............................................30

*Cardenas v. NBTY, Inc.*, 8
　70 F. Supp. 2d 984 (E.D. Ca. 2012) ...............................................30

*Conrad v. Nutramax*,
　13C3780, 2013 WL 5288152 (N.D. Ill. Sept. 18, 2013) ...........................18, 30

*Constantinides v. Alfa Laval, Inc.*,
　MDL Docket No. 875, 2010 U.S. Dist. LEXIS 85302 (E.D. Pa. June
　10, 2010) ..................................................................................22

*Dorfman v. Nutramax*,
　13cv0873,　2013 WL 5353043 (S.D. Ca. Sept. 23, 2013) ............................30

*Duckworth v. State Admin. Board of Election Laws*,
　332 F.3d 769 (4th Cir. 2003) ..........................................................15

*Edwards Systems Technology, Inc., v. Digital Control Systems*,
　99 Fed Appx. 911 (Fed. Cir. 2004).................................................22

*Erickson v. Pardus*,
　551 U.S. 89 (2007)........................................................................15

*Faron v. St. Joseph Hospital*,
　No. C-07-05602-SBA, 2008 WL 4820796 (N.D. Ca. Nov. 4, 2008)..............22

*Federal Trade Commission v. QT, Inc., et al.*,
  512 F.3d 858 (7th Cir. 2008) ....................................................30, 31

*Ferebee v. Chevron Chemical Co.*,
  736 F.2d 1529 (D.C. Cir. 1984)....................................................23

*Florida State Board of Administration v. Green Tree Financial Corp.*,
  270 F.3d 645 (11th Cir. 2001) .........................................................21

*Gannon International, Ltd. v. Blocker*,
  Case No. 4:10CV0835, 2011 WL 111885 (E.D. Mo. Jan. 13, 2011)..............22

*Ibarra v. United States*,
  120 F.3d 472 (4th Cir. 1997) .........................................................21

*Lizanetz v. St. Paul Guardian Insurance Co.*,
  No. 3-07-CV-0123-BD, 2008 WL 4865581 (N.D. Tex. Nov. 10, 2008)........23

*O'Connor v. Boeing North American, Inc.*,
  Case No. CV97-1554, 2004 U.S. Dist. LEXIS 31339 (C.D. Ca. June 7,
  2004) ..........................................................................................22

*Pearson v. Target Corp.*,
  No. 11 CV 7972, 2012 WL 7761986 (N.D. Ill. Nov. 9, 2012) ................18, 30

*Phillips v. Cohen*,
  400 F.3d 388 (6th Cir. 2005) .........................................................23

*Quinn v. Walgreens*,
  958 F. Supp. 2d 533 (S.D. N.Y. 2013) .............................................30

*In Re Westinghouse Securities Litigation*,
  90 F.3d 696 (3rd Cir. 1996) ...........................................................22

## STATUTES

28 U.S.C. §1291 .................................................................................1
Class Action Fairness Act of 2005, 28 U.S.C. §1332(d).........................................1

# RULES

F.R.Civ.P. 9(b) ...................................................................................... 19

F.R.Civ.P. 11 ..................................................................................... 2, 14

F.R.Civ.P. 12(b)(6) ......................... 5, 15, 20, 21, 22, 27, 28, 29

F.R.Civ.P. 60 ............................................................................. 1, 5, 27

F.R.Evid. 702 ...................................................................................... 30

# OTHER AUTHORITIES

Dietary Supplements: An Advertising Guide for Industry, a publication of
    the Federal Trade Commission (available at
    www.business.ftc.gov/documents/bus09-dietary-supplements-advertisi
    ng-guide-industry). ...................................................................... 26


PubMed (http://www.ncbi.nlm.nih.gov/pubmed) .................................... 24

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this putative class action under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d). The matter in controversy, exclusive of interest and costs, exceeds $5,000,000; is a class action in which there are in excess of 100 class members; and many of the class members are citizens of a state different from Defendants.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291. This is an appeal from a final Order of the District Court. The District Court issued a Memorandum Decision (JA 242-250), and entered an Order (JA 251) dismissing the Consolidated Amended Complaint (the "CAC") on June 20, 2014. Plaintiffs timely filed a Notice of Appeal on July 16, 2014. JA 252. Then, on July 25, 2014, Plaintiffs filed a Motion to Correct Mistake of Law Pursuant to F.R.C.P. 60. JA 258-262. On September 9, 2014, the District Court issued a Memorandum Decision (JA 300-304) and filed an Order (JA 305) denying Plaintiffs' Motion.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in dismissing Plaintiffs' CAC by misapplying the legal standard for assessing the sufficiency of a complaint as set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)?

1

2.  Whether, in its June 20, 2014 Order dismissing the CAC, the District Court erred in ruling that in a "battle of the experts," "[i]f there are experts who support what defendants say in their advertisements, the advertisements are not false and misleading, an unfair trade practice, or otherwise violative of the consumer protection statutes unless the clinical trial relied upon by the defendants was itself false and/or deceptive?"

3.  Whether the District Court erred in dismissing the CAC with leave to amend only if Plaintiffs could allege, within the strictures of Rule 11, that *no* reasonable expert could conclude that glucosamine and chondroitin do not improve joint health in non-arthritic consumers?

4.  Whether the District Court erred in its decision on the motion for reconsideration in ruling that: absent allegations that Defendants relied upon false and/or deceptive studies, data, or science to support their advertisements and marketing or that Plaintiffs' experts could testify that *no* expert could look at the available data and conclude, as Defendants did, that their products have an effect on non-arthritic users, then Plaintiffs are not entitled to relief on their pleadings?

## STATEMENT OF THE CASE

### I.  Nature of the Case

This putative class action involves misrepresentations made by Defendants, manufacturers and sellers of dietary supplements, regarding products that they market to persons suffering from osteoarthritis and from similar conditions and to persons who suffer from joint ailments.  These products, whose main ingredients are glucosamine and chondroitin, are marketed and advertised as being able to rebuild and regenerate cartilage; to promote joint mobility, flexibility, and comfort; and to cushion joints.[1]  These representations are directed at persons with osteoarthritis because these are the common symptoms of osteoarthritis – discomfort, lack of mobility/flexibility, and the degeneration of joint cartilage. They are also directed at consumers who may not be clinically diagnosed with osteoarthritis, but who, nevertheless, experience similar symptoms.

Defendants' representations -- that their TriFlex products promote joint mobility, flexibility, and comfort, cushion joints, and rebuild/regenerate cartilage -- are false. A vast body of scientific evidence, based upon the "gold standard" measure by which a substance's efficacy in humans is evaluated – randomized controlled clinical trials ("RCTS") – has conclusively established that the

---

[1] Cartilage is smooth, white tissue that covers the ends of bones at joints.  Cartilage is not vascularized and lacks blood flow.   Cartilage cannot be rebuilt or regenerated after damage from injury or disease such as osteoarthritis.  CAC ¶ 29, JA 32.

ingredients in these products do not provide any of these benefits for persons with osteoarthritis. Their inefficacy is so well established that major orthopedic organizations, like the American College of Rheumatology, do not recommend that persons take glucosamine or chondroitin dietary supplements. Likewise, for those people who do not have osteoarthritis but who suffer from joint ailments, this extensive body of scientific evidence from osteoarthritis RCTs is deemed to be a proxy by experts in the field to establish that the ingredients in these products are not effective and do not provide any of the represented benefits to non-arthritic consumers either.

Thus, there are two groups that comprise purchasers of Defendants' products who are being and have been defrauded by Defendants' misrepresentations: (1) persons with OA, the primary target market and the majority of purchasers of Defendants' products; and (2) persons without OA but who, like persons with OA, seek relief from joint pain, and/or improvement of joint mobility and regeneration of cartilage. Both groups are members of the proposed class herein.

## II. Course of Proceedings and Disposition Below

On January 1, 2014, the Judicial Panel on Multi-District Litigation issued an Order transferring several state law-based class actions filed in federal courts to the District Court below for management as a multi-district litigation ("MDL"). Docket Entry No. 1, JA 11-13. A few tag-along actions were subsequently

4

transferred to the MDL as well.  *See* Docket Entry Nos. 2, 3, and 21, JA 14-17, 77-78.  Plaintiffs' counsel established a leadership structure which the Court approved on February 19, 2014.  Docket Entry No. 16, JA 18-19.  On March 14, 2014, Plaintiffs filed their CAC.  Docket Entry No. 20, JA 20-76.

On April 4, 2014, Defendants filed their motion to dismiss the CAC.  Docket Entry No. 25, JA 79-81.  After the motion was fully briefed by the parties, the District Court heard oral argument on the motion on June 16, 2014.  Docket Entry No. 37, JA 206-241.  On June 20, 2014, the District Court filed a Memorandum Opinion and an Order dismissing the CAC pursuant to F.R.C.P. 12(b)(6).  Docket Entry Nos. 38 and 39.  JA 242-251.

On July 16, 2014, Plaintiffs timely filed their Notice of Appeal of the District Court's opinion and order dismissing the CAC.  Docket Entry No. 40, JA 252.  On July 25, 2014, Plaintiffs filed in the District Court their motion to correct mistakes of law pursuant to F.R.C.P. 60.  Docket Entry No. 43, JA 258-262.  After the motion was fully briefed, on September 9, 2014, the District Court issued a Memorandum Opinion and Order denying the motion and clarifying its earlier decision.  Docket Entry Nos. 51 and 52, JA 300-305.  This appeal follows.

## STATEMENT OF FACTS

### The TriFlex Products

GNC is a leading manufacturer, marketer, distributor, and seller of dietary supplements. CAC ¶¶ 23-24, JA 28. Among its broad array of dietary supplements, GNC manufactures, markets, distributes, and sells a line of joint health dietary supplements under its "TriFlex" brand name. This lawsuit concerns GNC's line of TriFlex branded products which include: (1) GNC TriFlex; (2) GNC TriFlex Fast-Acting; (3) GNC TriFlex Sport; and (4) GNC TriFlex Complete Vitapak (collectively, the "TriFlex Products"). CAC ¶¶ 1, 26, JA 21, 29-31. The primary purported active ingredients of the TriFlex Products are glucosamine hydrochloride and chondroitin sulfate. *Id.*

Plaintiff Lerma, a California resident, purchased TriFlex Fast-Acting in October 2012 at a GNC store in California. CAC ¶ 15, JA 25. Plaintiff Gaatz, an Illinois resident, purchased TriFlex Sport in January 2013 at a GNC store in Illinois. CAC ¶ 16, JA 25. Plaintiff Toback, a Florida resident, purchased TriFlex Complete Vitapak on several occasions in 2013 at GNC stores in Florida. CAC ¶ 17, JA 26. Plaintiff Calvert, an Ohio resident, purchased TriFlex Fast-Acting in mid-2013 at a GNC store in Youngstown, Ohio. CAC ¶ 18, JA 26. Plaintiff Howard, a resident of New York, purchased TriFlex Fast-Acting in July 2013 at a GNC store in Ontario County, New York. CAC ¶ 19, JA 26-27.

6

The GNC Plaintiffs each purchased the TriFlex Products in reliance on the representations on the products' labels. CAC ¶¶ 15-19, JA 25-27. The label on the TriFlex Fast-Acting Product states that the Product's "maximum," "clinical strength" formula supports "joint comfort," improves joint flexibility and "joint cushioning," and helps to "regenerate cartilage and lubricate joints thus supporting joint health integrity and function." CAC ¶ 3, JA 21-22. Similarly, the TriFlex Sport packaging states that it "protect[s] joints from wear and tear of exercise," and contains a compound that promotes "joint cushioning." CAC ¶ 4, JA 22. The TriFlex Complete Vitapak touts that it "rebuilds cartilage and lubricates joints" and "features clinically studied ingredients that support total joint health and provide joint comfort in as early as two weeks. These ingredients support mobility and flexibility, rebuild cartilage and lubricate joints." CAC ¶ 4, JA 22. GNC's website also contains all of the same misrepresentations about the TriFlex Products described above. CAC ¶ 34, JA 34.

The TriFlex Fast-Acting bottle references one study purportedly supporting GNC's "Clinical Strength" representation. CAC ¶ 32, JA 33. Tellingly, however, no information is included to enable consumers to locate and review the study to verify that claim. But by making this representation, GNC is falsely representing that the scientific/clinical evidence supports the representations that it makes about TriFlex Fast-Acting. Likewise, the TriFlex Fast-Acting bottle also represents that

7

"[s]cientific research" has shown that glucosamine and chondroitin "help to support the body's natural ability to regenerate cartilage and lubricate joints thus supporting joint health integrity and function" without reference to the specific scientific research upon which GNC relies. By making references to "clinical strength" and asserting that "scientific research" supports GNC's joint health benefits representations, GNC falsely claims that scientific and medical studies prove that the TriFlex Products provide benefits that they do not. Since the vast weight of competent and reliable scientific evidence is that the ingredients in GNC's TriFlex Products do not work as represented, these representations are false. *Id.*

The primary active ingredients in all of the TriFlex Products are glucosamine hydrochloride and chondroitin sulfate. CAC ¶ 29, JA 32. The scientific evidence is that glucosamine and chondroitin, taken alone or in combination, do not provide the joint health benefits represented by GNC. CAC ¶ 30, JA 32-33. In addition to the primary active ingredients, GNC's TriFlex Products contain lesser amounts of other ingredients, including MSM and HA. CAC ¶ 31, JA 33. These ingredients also fail to provide any of the benefits claimed by GNC. *Id.*

**The Rite Aid Products**

Rite Aid markets, sells, and distributes a line of joint health dietary supplements under its house-brand name that include glucosamine and chondroitin, among other ingredients. The Rite Aid Products are manufactured by GNC for Rite Aid. CAC ¶¶ 2, 35, JA 21, 34. The Rite Aid Products include: 1) Rite Aid Glucosamine/Chondroitin; 2) Rite Aid Natural Glucosamine/Chondroitin; 3) Rite Aid Glucosamine Chondroitin Advanced Complex; 4) Rite Aid Glucosamine Chondroitin, Triple Strength + MSM; 5) Rite Aid Glucosamine Chondroitin + MSM; and 6) Rite Aid Glucosamine Chondroitin Advanced Complex with HA (collectively, the "Rite Aid Products"). The Rite Aid Products' packaging includes representations that the Products "help[] rebuild cartilage and lubricate joints" and that they will "promote joint health." CAC ¶ 5, JA 22.[2]

Plaintiff Flowers, a California resident, purchased Rite Aid Products beginning in August 2009 at Rite Aid stores in the Santa Barbara and Goleta, California areas. CAC ¶ 20, JA 27. Plaintiff Gross, a resident of New Jersey, purchased several Rite Aid Products in 2011 and 2012 at Rite Aid stores in Deptford and West Deptford, New Jersey. CAC ¶ 21, JA 27-28. Plaintiff George,

---

[2] The representations made by GNC regarding the efficacy of the TriFlex and Rite Aid Products shall collectively be referred to herein as the "joint health benefits representations."

a Pennsylvania resident, purchased Rite Aid Natural Glucosamine/Chondroitin in October 2013 at a Rite Aid store in Pittsburgh, Pennsylvania.   CAC ¶ 22, JA 28.

The Rite Aid Plaintiffs each allege that they purchased the Rite Aid Products in reliance on the representations on the product labels.  CAC ¶¶ 20-22, JA 27-28. According to Rite Aid's website and the packaging/label, Rite Aid claims that these products "help rebuild cartilage and lubricate joints" or that they will "promote joint health."  CAC ¶¶ 5, 37, JA 22, 35.  The primary active ingredients in the Rite Aid Products are glucosamine hydrochloride and chondroitin sulfate. Some of the Rite Aid Products also include MSM.  CAC ¶ 36, JA 34.  These ingredients fail to provide any of the benefits alleged by Rite Aid.

**Scientific Studies Confirm That the Products Are Not Effective**

The overwhelming weight of high quality, credible, and reliable scientific studies, conducted by eminent researchers and published in renowned peer-reviewed journals, demonstrate that glucosamine and chondroitin, alone or in combination, do not provide any joint health benefits.  This has resulted in the scientific community generally recognizing that glucosamine and chondroitin, alone or in combination, cannot repair, regenerate, rebuild, maintain, preserve, renew, or rejuvenate cartilage, or rebuild joints, or improve joint health.  CAC ¶ 38, JA 35-36.  In the CAC, Plaintiffs cite a multitude of specific studies showing that

glucosamine and chondroitin, alone or in combination, do not provide the benefits that Defendants claim:  For example:

- In 2012, the American College of Rheumatology recommended that physicians not use glucosamine or chondroitin for knee arthritis (CAC ¶ 38, JA 35-36);

- In 2004, a study concluded that glucosamine was no more effective than a placebo in treating the symptoms of knee osteoarthritis (CAC ¶ 39, JA 36);

- In 2004, a study concluded that there was no difference in either the primary or secondary outcomes for the glucosamine and the placebo groups and that the study provided no evidence of symptomatic benefit from continued use of glucosamine (CAC ¶ 40, JA 36);

- In February 2006, the authors of the Glucosamine Arthritis Intervention Trial ("GAIT") sponsored by the National Institute of Health concluded that "the primary outcome measure did not show that [glucosamine and chondroitin], alone or in combination, was efficacious . . . ."  (CAC ¶ 41, JA 36-37);

- Subsequent GAIT studies in 2008 and 2010 reported that glucosamine and chondroitin did not rebuild cartilage and were otherwise ineffective – even in patients with moderate to severe knee pain for which the 2006 GAIT study's reported results were inconclusive (CAC ¶ 42, JA 37);

- In 2008, a study concluded that glucosamine was no better than the placebo in reducing symptoms and progression of hip osteoarthritis (CAC ¶ 43, JA 37);

- A 2010 meta-analysis reported that glucosamine and chondroitin, alone or in combination, did not reduce joint pain or have an impact on the narrowing of joint space compared with a placebo.  The authors went as far to say, "[w]e believe it unlikely that future trials will show

a clinically relevant benefit of any of the evaluated preparations" (CAC ¶ 44, JA 38);

- Another 2010 study concluded that there was no difference between placebo and glucosamine for the treatment of low back pain and lumbar osteoarthritis and that neither glucosamine nor a placebo was effective in reducing pain-related disability (CAC ¶ 45, JA 38);

- In 2011, a summary article reviewed the clinical study history of glucosamine and chondroitin and concluded that "[t]he cost-effectiveness of these dietary supplements alone or in combination in the treatment of OA has not been demonstrated in North America" (CAC ¶ 46, JA 38); and

- Most recently, a 2013 study concluded that MRI images, pain assessments, and urinalysis provided no evidence that glucosamine was more effective than the placebo in improving joint health.  (CAC ¶ 47, JA 38-39).

Scientific studies also confirm that the other ingredients in the TriFlex Products and the Rite Aid Products are ineffective.  With respect to MSM, a number of clinical studies have demonstrated no pain relief or other joint symptom relief after taking MSM.  CAC ¶ 48, JA 39.  Like chondroitin and glucosamine, MSM will not rebuild, repair, regrow, or renew cartilage or improve joint health. *Id*.  Furthermore, oral ingestion of HA does not have any efficacy in relieving joint pain and otherwise does not support improved joint health because HA is quickly degraded during digestion into its constituent parts  – two common sugars found in a normal diet.  Thus, the inclusion of HA does not provide any joint health benefits.  CAC ¶ 49, JA 39.

### The Impact of Defendants' Wrongful Conduct

Despite the vast weight of scientific evidence and clinical studies that demonstrate that the ingredients in the Products are ineffective, Defendants conveyed and continue to convey the opposite message. Specifically, GNC has claimed and continues to claim that the TriFlex Products help to promote mobility and flexibility, support "joint comfort," improve "joint cushioning," and "rebuild cartilage and lubricate joints." Similarly, Rite Aid has claimed and continues to claim that its Rite Aid Products "help[] rebuild cartilage and lubricate joints." CAC ¶ 50, JA 39-40.

As the manufacturers, distributors, and/or sellers of the Products, Defendants possess special knowledge regarding the content and effects of the ingredients contained in their Products and are in a superior position to learn of the effects – and have learned of the lack of effects – their Products have on consumers. Specifically, Defendants knew, but failed to disclose, that the Products do not provide the joint health benefits represented and that the overwhelming weight of well-conducted, clinical studies have found the ingredients in the Products to be ineffective in providing the joint health benefits represented by Defendants. CAC ¶ 51, JA 40.

## SUMMARY OF ARGUMENT

The District Court misapplied the controlling legal standards for assessing the sufficiency of a complaint as set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The District Court dismissed the CAC based on its erroneous application of these legal standards.

In its June 20, 2014 Order dismissing the CAC, the District Court erred in ruling that in a "battle of the experts," "[i]f there are experts who support what defendants say in their advertisements, the advertisements are not false and misleading, an unfair trade practice, or otherwise violative of the consumer protection statutes unless the clinical trial relied upon by the defendants was itself false and/or deceptive."

The District Court further erred in dismissing the CAC with leave to amend only if Plaintiffs could allege, within the strictures of Rule 11, that *no* reasonable expert could conclude that glucosamine and chondroitin do not improve joint health in non-arthritic consumers. Finally, the District Court erred in its decision on the motion for reconsideration in ruling that: absent allegations that Defendants relied upon false and/or deceptive studies, data, or science to support their advertisements and marketing or that Plaintiffs' experts could testify that *no* expert could look at the available data and conclude, as Defendants did, that their

14

products have an effect on non-arthritic users, then Plaintiffs are not entitled to relief on their pleadings.

## **ARGUMENT**

### I.  The Standard of Review is *De Novo*.

This appeal seeks review of the District Court's decisions on Defendants' Motion to Dismiss the CAC.  The District Court's grant of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim is evaluated under a *de novo* standard of review.  *Duckworth v. State Admin. Bd. of Election Laws*, 332 F.3d 769, 772 (4th Cir. 2003).  "[W]hen ruling on a defendant's motion to dismiss, a [trial] judge must accept as true all of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  To survive a motion to dismiss brought under F.R.C.P. 12(b)(6), "[f]actual allegations must be enough to raise a right to relief above the speculative level," with the complaint having "enough facts to state a claim that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555.  The plausibility requirement set forth in *Twombly* does not create a probability requirement, but rather, a plaintiff must display "more than a sheer possibility" that the defendant is liable for the misconduct alleged in the complaint.  *Ashcroft v. Iqbal*, 556 U.S. at 678.

## II. The District Court Erroneously Dismissed The CAC On June 20, 2014

The state law classes alleged in the CAC include all persons who purchased the products at issue in their respective states within the relevant statutes of limitation. CAC ¶¶57-67.  JA 41-44.  Plaintiffs have alleged that they were deceived by the joint health benefits representations on the front, back, and sides of the product labels, and as a result, they purchased the products and lost money.  CAC ¶¶15-22. JA 25-28.   The classes, as defined, include persons who suffer from osteoarthritis (OA) and persons who may not have been clinically diagnosed with OA, but who are seeking joint relief from symptoms similar to those associated with OA.

The District Court ignored that the CAC specifically alleges that a primary target market for Defendants' products is persons suffering with OA (CAC ¶6, JA 22).  Instead, the District Court focused on non-arthritic consumers – which the District Court considers, without foundation, the named plaintiffs to be.[3]   The District Court dismissed the CAC on the ground that Plaintiffs' allegations of falsity were not plausible with regard to persons who do not have OA:

---

[3] Nowhere does the CAC characterize the named plaintiffs as being either non-arthritic consumers or arthritic consumers.  Rather, the CAC paragraphs describing the named plaintiffs allege only that they are consumers who saw Defendants' joint health representations on the product labels, were deceived thereby, would not have purchased the products had they known of the falsity of the representations, and thereby were injured by having lost money.  *See, e.g.,* CAC ¶15, JA 25 (allegations as to named plaintiff Michael Lerma).

The studies cited by plaintiffs may well be sufficient to support their conclusory allegation concerning the 'vast weight' of the evidence. However, in order for the advertisements of defendants to be false or deceptive, to constitute an unfair trade practice, or otherwise to violate the relevant consumer protection laws *as to non-arthritic consumers – such as the named plaintiffs* – plaintiffs must rely upon their allegation that 'experts in the field' consider the studies to be a valid proxy for measuring the effectiveness of glucosamine and chondroitin in non-arthritic users. Although undoubtedly plaintiffs' experts will testify to a reasonable degree of medical certainty, there is no allegation that their views regarding the existing studies' ability to serve as a 'proxy' is anything more than their own professional opinions. Notably, the CAC does not allege that 'experts in the field' are prepared to testify that, on the basis of the existing scientific evidence, any reasonable expert would conclude from the cited studies that glucosamine and chondroitin are ineffective in non-arthritic consumers. Likewise, there is no allegation that the clinical trial relied upon by defendants: (1) does not exist at all, (2) exists but does not support any of GNC's representations about TriFlex, or (3) exists and supports the assertions on TriFlex Fast-Acting's bottle, but was not conducted in an appropriately scientific manner. (Emphasis added).

JA 247-248.

Again, focusing solely on non-arthritic consumers, the District Court held:

Against this background, the mere existence of a 'battle of the experts' on the issue of glucosamine and chondroitin's effect on non-arthritic consumers is not sufficient to establish that defendants' advertisements violate the state consumer protection statutes in this case. Disagreements between experts, even under the 'reasonable degree of scientific certainty' standard, are to be expected. In my judgment, however, the fact that one set of experts may disagree with the opinions expressed by other qualified experts does not *ipso facto* establish any violation of the applicable consumer protection laws. *If there are experts who support what defendants say in their advertisements, the advertisements are not false and misleading, an unfair trade practice, or otherwise violative of the consumer protection statutes, unless the clinical trial relied upon by defendants was itself false and/or deceptive.* (Emphasis added).

JA 248.

17

Respectfully, that is not the law under *any* of the states' consumer fraud statutes pursuant to which Plaintiffs' claims are being prosecuted. Nor could it be. It is *not* the battle of the experts which *ipso facto* establishes a violation of the consumer protection laws. Rather, the battle of the experts (if, indeed, there is one) simply informs the ultimate fact finder's determination whether the advertising and marketing claims are sufficiently grounded in credible science, or whether such claims have the capacity to mislead or deceive the average consumer. To hold otherwise, would permit a manufacturer of the most dubious product to engage an "expert" and then contend it was immune from a consumer fraud action simply because the plaintiffs' claims could be reduced to a "battle of the experts."

Consumer fraud claims, particularly in the nutraceutical and dietary supplement industry, are sustained, especially at the pleading stage, in the face of such expert "battles." *See, e.g., Conrad v. Nutramax*, 13C3780, 2013 WL 5288152 (N.D. Ill. Nov. 9, 2012)("As in *Pearson*, a case squarely on point with the present action, studies cited by Conrad involve the primary active ingredients in Cosamin DS – glucosamine and chondroitin … Whether or not these studies apply to Cosamin DS is a question of fact that this Court cannot now decide. Conrad's claim is facially plausible due to the findings of these studies with respect to the primary active ingredients in Coasmin DS."); *Pearson v. Target Corp.*, No. 11 CV 7972, 2012 WL 7761986 (Nov. 9, 2012) (denying motion to dismiss, concluding

that plaintiff satisfied Rule 9(b)'s particularity requirement "by pointing to specific clinical studies … and alleging with particularity how the results of these studies refute specific representations made on Up & Up Triple Strength's packaging.").

Imagine, however, if a defendant peddling a cure for cancer could insulate itself from various states' consumer protection laws simply by retaining an expert to offer her "learned" opinion that the product is effective as advertised.  Such a result would render impotent the consumer protection laws that prevent unscrupulous companies from unfairly preying upon unsuspecting consumers.

Notably, the District Court cites to no cases in support of its holdings.  Nor could it, as the lower court's rulings are erroneous for numerous reasons.  First, in finding that the CAC fails to allege that Defendants committed consumer fraud, the District Court completely ignores the CAC's allegations of consumer fraud that Defendants are perpetrating on a target market – consumers suffering from OA. CAC ¶6, JA 22.[4]    Even using the District Court's flawed analysis, the District Court should have sustained the CAC as to consumers suffering from OA -- consumers who are plainly included within the class definitions.  Instead, the

---

[4] The CAC clearly alleges that the vast weight of scientific evidence, consisting of clinical studies of persons suffering from OA, conclusively demonstrates that the ingredients in Defendants' products are worthless and no better than a sugar pill with respect to the joint health benefits Defendants represent the products provide. CAC ¶¶7, 8, 38-49, JA 23, 35-39.

19

District Court focused entirely on whether the CAC adequately alleges that a consumer fraud is being committed on non-arthritic consumers.  JA 247-248.

The District Court also completely ignored that the CAC seeks injunctive relief to stop Defendants' frauds, including Defendants' frauds that have been and continue to be perpetrated on persons with OA.  *See, e.g.,* CAC ¶¶ 95, 101, 123, 130, 139, 168, 175, 187, Prayers for Relief 4 and 5, JA 52-53, 57-59, 65-66, 68, and 71.  Thus, even if one were to accept that the CAC did not state a claim with regard to persons without OA (which is not the case), the District Court's holdings ignore altogether the CAC's plainly sufficient state law claims regarding persons with OA who purchased these products based on Defendants' false and misleading product labels and advertising and were deceived and injured thereby.

With respect to Plaintiffs' allegations regarding the applicability of the OA clinical studies set forth in the CAC to persons without OA, the District Court erred as a matter of law in dismissing these allegations because the answer to this question necessarily turns on a "battle of experts."  JA247-248.   Framing the issue as one that turns on a "battle of experts" acknowledges that the issue turns on a question of fact that *cannot* be dismissed on a Rule 12(b)(6) motion.  The District Court's analysis thus flies in the face of the requirement that in considering a Rule 12(b)(6) motion, the court must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the

20

light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). The District Court should have accepted as true, for the purposes of deciding the Rule 12(b)(6) motion, the CAC's well-pled allegation in Paragraph 7, footnote 5, that "[w]hile most of the clinical studies finding a lack of efficacy (using the same ingredients and amounts as are in the TriFlex Products) were performed on arthritic patients and in turn most concerned knee arthritis, experts in the field deem these clinical studies to be appropriate proxies for whether the ingredients are effective for other joints in the body and for both arthritic and non-arthritic users of these ingredients." JA 23.

Had the District Court followed this fundamental principle of accepting this allegation as "true" for the purpose of deciding Defendants' Rule 12(b)(6) challenge, as it was *required* to do, the District Court would not have granted Defendants' motion on the basis of an alleged "battle of the experts." Indeed, cases are legion that it is an error as a matter of law for a court to dismiss a complaint on the ground that a defendant's liability will turn upon a "battle of experts." *See, e.g., Florida State Board of Administration v. Green Tree Financial Corp.*, 270 F.3d 645, 666 (11th Cir. 2001) ("But neither the district court, nor we, can conduct a battle of the experts on a motion to dismiss. Rather, we must assume the truth of the allegations pleaded with particularity in the complaint. The strong-inference pleading standard does not license us to resolve disputed facts at

21

this state of the case."); *Barrie v. Intervoice-Brite, Inc.,* 397 F.3d 249, 257-58 (5th Cir. 2005)(same, quoting *Green Tree*); *In Re Westinghouse Securities Litigation*, 90 F. 3d 696, 709 fn. 9 (3rd Cir. 1996) ("Resolution of a battle of expert sources -- as defendants expert to occur here -- is inappropriate on a motion to dismiss"); *Gannon International, Ltd. v. Blocker*, Case No. 4:10CV0835, 2011 WL 111885 * 7 fn. 10 (E.D. Mo. Jan. 13, 2011)(ruling on a battle of experts is "improper for a motion to dismiss."); *O'Connor v. Boeing North American, Inc.*, Case No. CV97-1554, 2004 US Dist. LEXIS 31339 (C.D. Ca. June 7, 2004). By recognizing that a "battle of the experts" likely will take place, the District Court erred in dismissing the CAC on a Rule 12(b)(6) motion.[5]

The District Court erred in allowing an anticipated "battle of the experts" to doom the complaint at the pleading stage. Here, resolution of the issue of whether Defendants deceptively market products because their products are ineffective for both arthritic and non-arthritic persons presents a distinct question of fact that can and will be resolved, at trial, by the jury, after receiving expert testimony. The instant case is no different in this regard than any other case which involves

_____

[5] In a similar vein, the existence of a battle of the experts precludes entry of summary judgment, let alone dismissal of a complaint. *Edwards Systems Technology, Inc., v. Digital Control Systems*, 99 Fed Appx. 911, 922 (Fed. Cir. 2004) (battle of the experts renders summary judgment improper); *Faron v. St. Joseph Hospital*, No. C-07-05602-SBA, 2008 WL 4820796 (N.D. Ca. Nov. 4, 2008) * 4 (same); *Constantinides v. Alfa Laval, Inc.*, MDL Docket No. 875, 2010 U.S. Dist. LEXIS 85302 *12, fn. 6 (E.D. Pa. June 10, 2010) (same).

resolution of scientific issues – experts from both sides will testify and the jury will determine which side's experts are correct. *See Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (judicial weighing of expert opinion constitutes improper fact-finding, and "it is up to a jury to evaluate what weight and credibility each expert opinion deserves"); *Ferebee v. Chevron Chemical Co*., 736 F.2d 1529, 1535 (D.C. Cir. 1984) (battle of the experts must be decided by jury); *Lizanetz v. St. Paul Guardian Ins. Co.,* No. 3-07-cv-0123-BD, 2008 WL 4865581 * 1 (N.D. Tex. Nov. 10, 2008).

Yet, the District Court, by dismissing the CAC because of this purported "battle of the experts," has usurped Plaintiffs' rights to a jury trial, apparently believing that a special rule should apply to consumer fraud cases. But there is no such rule, nor could there be one.

The District Court decision relies heavily on a purported study by Defendants supporting their marketing claims. Indeed, the District Court based its dismissal of the CAC, in part, because "there is no allegation that the clinical trial relied upon by defendants: (1) does not exist at all, (2) exists but does not support any of GNC's representations about TriFlex, or (3) exists and supports the assertions on TriFlex Fast-Acting's bottle, but was not conducted in an appropriately scientific manner." JA 248. As a threshold matter, the District Court ignores the CAC's allegations criticizing the *bona fides* of this purported study.

23

Paragraph 32 of the CAC (JA 33) alleges: "The TriFlex Fast-Acting bottle references one study purportedly supporting GNC's 'Clinical Strength' representation. Tellingly, no information is included on the label to enable consumers to locate and review the study to verify that claim."

The "study" is referred to in a footnote on the TriFlex Fast-Acting bottle's label. It purports to involve a total of 60 subjects, and supposedly describes results that are "statistically significant in measures of joint function and joint flexibility within 30 days compared to subjects on placebo." *See* Exhibit C, attached to Defendants' Motion to Dismiss (an exemplar of this label), JA 193. Significantly, the summary in the footnote does not provide the title of the study, its authors, or what, if any, journal published it. Defendants, in their dismissal papers, failed to supply any of this information regarding the study, expressly disclaiming any affirmative duty to provide Plaintiffs (or the court, for that matter) with access to the study. *See* Defs. Reply Memo. on Motion to Dismiss at 8 fn. 5, JA 162. Thus, on the record before the District Court, other than the opaque summary of the purported results of this unidentified study in a footnote on the side panel of one of Defendants' products, there is no evidence in the record that this study actually exists.[6]

---

[6] Further corroboration of this is found in the fact there has been no study registered with the NIH's ClinicalTrials.gov website involving any Triflex products. Likewise, a search of PubMed (http://www.ncbi.nlm.nih.gov/pubmed),

Of course, without the study being placed in the record and without any means of obtaining this purported study (there being no citation to the study anywhere), Defendants' arguments and the District Court's agreement with these arguments is a classic example of a Catch-22. How can Plaintiffs plead anything about the study, even whether it exists, let alone whether its results are what Defendants say they are? How were Plaintiffs supposed to plead anything about this study other than that Defendants made these self-serving statements on the side panel of one of their product labels? Likewise, the mere fact that Defendants may possess a study or that other studies may exist that purport to support the efficacy of the ingredients in Defendants' products does not, as the District Court appears to hold, constitute a complete defense to consumer fraud claims such that dismissal is warranted.

The mere existence of conflicting clinical study results does not exonerate Defendants from answering the question as to whether the weight of the scientific evidence is that Defendants' products are worthless. The Federal Trade Commission has pronounced, in connection with health claims made about dietary

---

the comprehensive medical publication library maintained by the United States National Library of Medicine/National Institutes of Health, containing over 24 million citations to biomedical literature from all over the world, reveals that there is no study on TriFlex that has been published. The Court can take judicial notice of these facts and search results since each of these web sites is maintained by the NIH, a governmental agency delegated the responsibility of maintaining these web sites.

supplements, that the "totality of the evidence" must be looked at. "Studies cannot be evaluated in isolation. The surrounding context of the scientific evidence is just as important as the internal validity of individual studies.   Advertisers should consider all relevant research relating to the claimed benefit of their supplement and should not focus only on research that supports the effect, while discounting research that does not. Ideally, the studies relied on by an advertiser would be largely consistent with the surrounding body of evidence." *See Dietary Supplements: An Advertising Guide for Industry* at Section 4, a publication of the Federal Trade Commission (available at www.business.ftc.gov/documents/bus09-dietary-supplements-advertising-guide-industry).

The allegations made in the CAC are that the vast weight of scientific evidence demonstrates that the ingredients in Defendants' products are ineffective. That Defendants may possess a study or studies that find to the contrary merely creates a question of fact as to whether the weight of the scientific evidence supports Plaintiffs' claims or supports Defendants' claims.

At a minimum, the allegations in the CAC created a plausible question of fact as to whether Defendants' products are effective as represented.   These allegations should not have been dismissed because Plaintiffs had not (and could not) plead any facts about this one small study (allegedly involving only 60 subjects), particularly without the benefit of any discovery regarding the *bona fides* of this

study and how it fits into the context of the results of the vast weight of RCTs that have concluded directly the opposite – *i.e.,* that the ingredients in Defendants' products are worthless and no better than a sugar pill.

If a defendant's liability for consumer fraud at the motion to dismiss stage turns upon whether it can cite to one unpublished, undisclosed study of 60 persons[7] when  multiple independent studies (including studies approved by the National Institute of Health) involving thousands of subjects point to an entirely different conclusion, then it would be open hunting season on consumers.  Yet, the District Court focused on the purported results of just one such small purported study to the exclusion of the vast weight of RCTs to the contrary.  The District Court thus plainly erred in dismissing the CAC in its June 20, 2014 Memorandum and Order.

### 1.  RULE 60(b) MOTION

Because of the fundamental errors in the District Court's initial June 20, 2014 ruling, leading to its dismissal based upon a mistake of law, Plaintiffs moved pursuant to F.R.C.P. 60(b) for the District Court to reconsider its initial decision. The District Court erroneously denied the Rule 60(b) motion on September 9, 2014, and in so doing, further illustrated why its initial ruling was erroneous. Clarifying its previous order and memorandum to eliminate any confusion, the

---

[7] Even then, the study only involves one product sold by one of the Defendants.  So it is hard to fathom how this one small study should merit the dismissal of all of Plaintiffs' claims.

District Court stated, "In order to recover, plaintiffs must show that defendants' products are ineffective as to non-arthritic users." JA 303. Of course, as discussed above, this "clarification" only further demonstrates that the District Court completely ignored the fact that the CAC not only alleged that Defendants' joint health representations were directed at the relief of the primary symptoms of OA, but that the CAC alleged that, while the products were also proven to be ineffective for non-arthritic persons, a primary target market for Defendants' products was persons with OA.

The District Court then acknowledged that "[w]hether such studies [the OA studies] are a valid proxy is indeed a factual matter perhaps best left to the fact-finder, but plaintiffs' burden at the 12(b)(6) stage is to state a plausible claim upon which relief can be granted." JA303. Having acknowledged that the proxy allegation raises a factual question, there is and was only one conclusion – that Plaintiffs had, in fact, stated a claim for non-arthritic purchasers of the products, and thus had stated a claim for all purchasers of the products. Yet, instead of reaching this conclusion, the District Court mistakenly maintained its Catch-22 rationale, stating, "Plaintiffs have not alleged that defendants relied upon false and/or deceptive studies, data or science to support their advertisement and marketing." *Id.* Absent discovery, Plaintiffs have no idea what studies Defendants

purportedly rely upon for support of their representations.[8]  What the CAC and the record reflect now is that, for purposes of stating a claim, Plaintiffs have alleged that the vast weight of scientific evidence is that Defendants' products are worthless for both arthritic and non-arthritic users, and Plaintiffs have buttressed that allegation with detailed averments about many of those studies.

Nevertheless, the District Court, in its denial of the Rule 60(b) motion stated that Plaintiffs have also failed to allege that their experts "(who would testify that osteoarthritis studies are valid proxies for measuring clinical effects in non-arthritic patients) would testify that *no* expert could look at the available data and conclude, as defendants did, that their products have an effect on non-arthritic users." *Id.* (emphasis added by the Court).  Plaintiffs or their experts do not have the burden to prove that "no" expert would ever opine that these products work for non-arthritic users.  It is also not Plaintiffs' burden to allege that "no" expert would ever opine that these products work for arthritic users.

In order to meet the pleading requirements of Rule 12(b)(6), it is enough that Plaintiffs have made allegations of fact that the vast body of scientific evidence establishes that these products are worthless for both arthritic and non-arthritic users.  These are not naked allegations - Plaintiffs have cited to numerous studies,

---

[8] There is no evidence in the record that Defendants have relied upon any studies at all at this point and only discovery will flush that out.

29

including the largest and most definitive study to date conducted by the NIH.[9]

Plaintiffs have also cited to nationally regarded entities and experts in this area to

support their allegations.  Clearly, these allegations pass the plausibility test and

should be sustained.[10]

Finally, in a footnote, the District Court completely dismisses the important

role that juries play in determining questions of fact, and in so doing, makes a

special rule for this case.  While the District Court notes that juries do play an

important role and "serve as a proper check upon allegedly expert elitism"[11] it goes

on to say: "However, in this case the question is not whether the views of jurors

---

[9]  These studies, published in the leading peer-reviewed journals, analyze placebo-controlled, double-blind clinical trials, which are the "gold standard" of clinical research. *See, e.g., Federal Trade Commission v. QT, Inc., et al.*, 512 F.3d 858, 863 (7th Cir. 2008) (placebo-controlled, double-blind testing is the best form of testing).

[10]  Notably, Plaintiffs allege substantially identical facts as in the numerous complaints against other manufacturers of glucosamine/chondroitin products which have been sustained by federal courts across the country.  *See, e.g., Calvert v. Walgreen Co.*, 13 Civ. 1161 (AJS) (W.D. Pa. May 6, 2014); *Pearson v. Target Corp.*, No. 11 CV 7972, 2012 WL 7761986 (N.D. Ill. Nov. 9, 2012); *Conrad v. Nutramax*, 13C3780, 2013 WL 5288152 (N.D. Ill. Sept. 18, 2013); *Dorfman v. Nutramax*, 13cv0873, 2013 WL 5353043 (S.D. Cal. Sept. 23, 2013); *Quinn v. Walgreens*, 958 F. Supp.2d 533 (S.D.N.Y. 2013); and *Cardenas v. NBTY, Inc.*, 870 F. Supp.2d 984 (E.D. Cal. 2012).

[11]  It is not clear what the District Court means by the phrase "expert elitism" since Federal Rule of Evidence 702 clearly recognizes the important role that experts play in the determination of complex issues.  And this Court can surely take judicial notice that use of experts in a substantial number, if not the majority, of civil and criminal matters is commonplace.

should prevail over the views of those who choose to purchase glucosamine/chondroitin pills." *Id.* at fn. 5.

Of course, this completely misconstrues the nature and purpose of Plaintiffs' claims. Plaintiffs are not seeking to have these products removed from the market or to interfere with persons who may choose to purchase Defendants' products. This suit does not seek to stop Defendants from selling their products. Rather, Plaintiffs seek injunctive relief requiring Defendants to stop selling their products *deceptively*, and Plaintiffs seek compensation for the economic injuries caused by Defendants' deceptive practices. These are important goals, fundamental to the health of our free market system. *See, e.g., Federal Trade Commission v. QT, Inc., supra*, 512 F.3d at 863 (one important reason for requiring truth in advertising is so competition in the market will lead to correct prices). And the prevention of deceptive and unfair trade practices is the express goal of the consumer fraud laws under which these cases have been brought.

In footnote 5, the District Court further exposes its real reasons for dismissing Plaintiffs' claims. The District Court believes that consumer actions and the fact that the questions they present are decided by juries, is undemocratic and may be tyrannical. "What is 'democratic' in one instance may be tyrannical in another. After all, damage awards and even the cost of defending against high stakes litigation has the effect of increasing the cost of glucosamine/chondroitin

31

pills or, potentially, driving the pills from the market. Should those who choose to purchase the pills have to pay more for them (or be deprived of the opportunity to purchase them at all) when the science is uncertain merely because juries disagree with their own judgment about the pills' efficacy?" *Id.*

In one fell swoop, the District Court eviscerates the jury system, and judicially legislates consumer fraud laws out of existence.  This action is no different than any other consumer fraud action – it seeks to enhance a marketplace in which truthful information is disseminated by removing deceptive information, and it seeks monetary compensation for those who have been previously injured by these false representations. Yet, the District Court apparently views this as "tyrannical" if a jury finds that, in fact, Defendants have falsely advertised their products, because, in its view, such a result might cause the products to be removed from the market or cause those who buy them in the future to pay more because of any judgment that is entered against the Defendants.  This is pure speculation and is a construct that would result in the dismissal of nearly all consumer fraud actions.

## CONCLUSION

For the reasons stated above, this Court should: (1) reverse the District Court's dismissal of the CAC; (2) reinstate the CAC, and (3) remand for further proceedings.

32

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 34(a), Plaintiffs respectfully request oral argument. This case presents novel issues and will impact the rights of several million consumers.  Plaintiffs therefore believe that oral argument will assist the Court in understanding the issues on appeal and the arguments as to why it should reverse the District Court's Orders dismissing the CAC.

Dated: November 4, 2014

> Respectfully submitted,
>
> By:/s/    Robert J. Berg
> Jeffrey I. Carton
> DENLEA & CARTON LLP
> One North Broadway, Suite 509
> White Plains, New York  10601
> Telephone: (914) 920-7400
> Facsimile:  (914) 761-1900
>
> *Attorneys for Plaintiffs-Appellants*
> *And for Plaintiff Robert Toback*

Of Counsel:

**BONNETT, FAIRBOURN,**
   **FRIEDMAN & BALINT, P.C.**
Elaine A. Ryan
Patricia N. Syverson
Lindsey M. Gomez-Gray
2325 E. Camelback Rd., 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199

33

eryan@bffb.com
psyverson@bffb.com
lgomez-gray@bffb.com

**BONNETT, FAIRBOURN,**
  **FRIEDMAN & BALINT, P.C.**
Manfred P. Muecke
600 W. Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 756-7748
Facsimile:  (602) 274-1199
mmuecke@bbfb.com

**STEWART M. WELTMAN, LLC**
Stewart M. Weltman
53 W. Jackson Suite 364
Chicago, IL 60604
Telephone:  (312) 588-588-5033
sweltman@weltmanlawfirm.com
(Of Counsel Levin Fishbein Sedran & Berman)

*Counsel to Plaintiffs Michael Lerma and Jeremy Gaatz*

**CARLSON LYNCH LTD.**
R. Bruce Carlson
Gary F. Lynch
Benjamin J. Sweet
Edwin J. Kipela, Jr.
Stephanie K. Goldin
Jamisen A. Etzel
PNC Park
115 Federal Street, Suite 210
Pittsburgh, PA 15212
Telephone:  (412) 322-9243
Facsimile:  (412)231-0246
bsweet@carlsonlynch.com
ekipela@carlsonlynch.com

**STEVEN D. BELL CO. L.P.A.**
Steven D. Bell
7650 Chippewa Road, Suite 309
Brecksville, OH 44141
Telephone:  (216) 925-5484
Facsimile:  (216) 925-5480
steve@stevebell-law.com

*Counsel for Plaintiff Robert Calvert*

**CARLSON LYNCH LTD.**
R. Bruce Carlson
Gary F. Lynch
Benjamin J. Sweet
Edwin J. Kipela, Jr.
Stephanie K. Goldin
Jamisen A. Etzel
PNC Park
115 Federal Street, Suite 210
Pittsburgh, PA 15212
Telephone:  (412) 322-9243
Facsimile:  (412)231-0246
bsweet@carlsonlynch.com
ekipela@carlsonlynch.com

**MARCUS & CINELLI, LLP**
David P. Marcus
2821 Wehrle Drive, Suite 3
Williamsville, NY 14221
Telephone:  (716) 565-3800
Facsimile:  (716) 565-3801

*Counsel for Plaintiff Shawn Howard*

**CARLSON LYNCH LTD.**
R. Bruce Carlson
Gary F. Lynch
Benjamin J. Sweet
Edwin J. Kipela, Jr.

35

Stephanie K. Goldin
Jamisen A. Etzel
PNC Park
115 Federal Street, Suite 210
Pittsburgh, PA 15212
Telephone:  (412) 322-9243
Facsimile:  (412)231-0246
bsweet@carlsonlynch.com
ekipela@carlsonlynch.com

**NYE, PEABODY, STIRLING, HALE & MILLER, LLP**
Jonathan D. Miller
Jennifer M. Miller
33 West Mission Street, Suite 201
Santa Barbara, California  93101
Phone: (805) 963-2345
Fax: (805) 563-5385
jonathan@nps-law.com
jennifer@nps-law.com

*Attorneys for Rite Aid Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

1. This brief has been prepared using a proportionally spaced serif typeface, Times New Roman, 14 point font using Microsoft Word.

2. Exclusive of: table of contents; table of authorities; any addendum containing statutes, rules, or regulations; and the certificate of service this brief contains <u>8,194</u> words.

3. I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or copy of the word or line printout.

> By:   <u>/s/   Robert J. Berg</u>
>       Jeffrey I. Carton
>       DENLEA & CARTON LLP
>       One North Broadway, Suite 509
>       White Plains, New York  10601
>       Telephone: (914) 920-7400
>       Facsimile:  (914) 761-1900
>
>       *Attorneys for Plaintiffs-Appellants*

37

## **CERTIFICATE OF SERVICE**

I declare under penalty of perjury that the following is true and correct:

On the 4th day of November, 2014, I electronically filed the foregoing OPENING BRIEF OF APPELLANTS with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic filing to all counsel of record.

Gordon W. Schmidt
Courtney S. Schorr
MCGUIREWOODS, LLP
23rd Floor
625 Liberty Avenue
Pittsburgh, PA 15222
(412) 667-6000

E. Duncan Getchell, Jr.
MCGUIREWOODS, LLP
1 James Center
901 East Cary Street
Richmond, VA 23219-4030
(804) 775-4388

Counsel for Appellees

By:/s/   Robert J. Berg
Jeffrey I. Carton
DENLEA & CARTON LLP
One North Broadway, Suite 509
White Plains, New York  10601
Telephone: (914) 920-7400
Facsimile:  (914) 761-1900

*Attorneys for Plaintiffs-Appellants*

38